T.C. Memo. 2009-257

UNITED STATES TAX COURT

MOHAMMAD ENAYAT, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

WOODBURY RUG COMPANY, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 1488-07, 1489-07.     Filed November 10, 2009.

William E. Christie, for petitioners.

Daniel P. Ryan and Erika B. Cormier, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, Judge:  Petitioner Mohammad Enayat operated a
Persian rug business, in some years through his wholly owned
C corporation, petitioner Woodbury Rug Company, Inc. (Woodbury),
and in later years through his single-member limited liability
company (LLC), Sutter & Hayes.  In 1998 through 2001, business

revenues and other receipts were deposited into and transferred among various personal and business bank accounts, and Mr. Enayat admits that his bookkeeping was "horrible".  For those years Mr. Enayat filed his own returns late and the C corporation's returns late or not at all.  The Internal Revenue Service (IRS) issued to Mr. Enayat a statutory notice of deficiency on October 17, 2006, pursuant to section 6212,[1] showing the following deficiencies in income tax and additions to tax, respectively, for tax years 1998 to 2001:

| Year | Deficiency | Addition to tax Sec. 6651(a)(1) | Fraud Penalty Sec. 6663(a) |
|------|-----------|------------------|-----------------|
| 1998 | $349,442 | $87,361 | $262,082 |
| 1999 | 65,632 | 16,408 | 49,224 |
| 2000 | 110,080 | 27,520 | 82,560 |
| 2001 | 29,231 | 7,308 | 21,923 |

On the same date the IRS also issued a notice of deficiency to Woodbury, showing the following deficiencies in income tax and additions to tax, respectively, for tax years 1998 and 1999:

| Year | Deficiency | Additions to Tax Sec. 6651(a)(1) | Sec. 6651(f) | Fraud Penalty Sec. 6663(a) |
|------|-----------|------------------|--------------|-----------------|
| 1998 | $74,010 | $18,503 | --- | $55,505 |
| 1999 | 46,499 | --- | $34,837 | --- |

---

[1]Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code of 1986 (26 U.S.C.), as amended, and all citations of Rules refer to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are:[2]

### Business Income Issues

(1)  Whether Mr. Enayat had unreported constructive dividend income of $203,273 in 1998 and $31,723 in 1999, as a result of his depositing into his personal accounts checks payable to Woodbury.  We find that he did.

(2)  Whether Mr. Enayat had unreported officer's compensation of $349,356 in 1998 and $67,200[3] in 1999, as a result of transferring funds from Woodbury accounts to his personal accounts.  We find that he did, and that Woodbury is therefore entitled to deductions in those same amounts.

(3)  Whether Woodbury had unreported gross receipts of $246,352 for taxable year 1998.  We find that it did.

(4)  Whether Woodbury had unreported gross receipts of $162,050 for taxable year 1999.  We find that it did.

---

[2]Mr. Enayat does not dispute the following adjustments to income in the notice of deficiency:  gambling income of $16,800 in 1998; rental income of $2,000 in 1998; income from insurance proceeds of $201,929 in 2000; and gross receipts on Schedule C, Profit or Loss From Business, in the amount of $113,800 in 2001. The other adjustments set forth on the Form 4549-B, Income Tax Examination Changes, that is attached to the notice of deficiency issued to Mr. Enayat are computational, and their resolution will follow automatically from the Court's determinations with regard to the issues resolved in this opinion.

[3]Respondent concedes that Mr. Enayat transferred only $67,200 from Woodbury's accounts to his personal accounts in 1999, not $85,200 as reflected in the notice of deficiency.

(5)  Whether Mr. Enayat received additional income of $1,228 in 1999 and $252,721 in 2000 from his LLC, Sutter & Hayes.  We find that he did.

### Other Income Issues

(6)  Whether Mr. Enayat received additional income of $305,101 in 1998 as a result of a transfer from Dr. William Willitts.  We find that he did not.

(7)  Whether Mr. Enayat is entitled to deduct capital losses of $71,812[4] in 1998 and $46,807 in 1999, from the sale of the Elm Street property.  We find that he is not.

### Additions to Tax and Penalty Issues

(8)  Whether Mr. Enayat is liable for additions to tax under section 6651(a)(1) for the failure to timely file his tax returns for taxable years 1998 through 2001.  We hold that he is.

(9)  Whether Mr. Enayat is liable for the fraud penalty under section 6663(a) for the four years 1998 through 2001.  We hold that he is liable for the fraud penalty for the three years 1998, 2000, and 2001, but in amounts less than those determined in the notice of deficiency.  We hold that Mr. Enayat is not liable for the fraud penalty for the year 1999.

---

[4]The correct amount for the capital gains adjustment in 1998 is $71,812, not $74,812 as stated in the notice of deficiency. See infra note 23.

(10) Whether Woodbury is liable for the addition to tax under section 6651(a)(1) for the failure to timely file its tax return for 1998. We hold that it is not.

(11) Whether Woodbury is liable for the fraud penalty under section 6663(a) for the year 1998. We hold that it is not.

(12) Whether Woodbury is liable for the addition to tax under section 6651(f) for the fraudulent failure to file its tax return for the year 1999. We hold that it is.

FINDINGS OF FACT

This case was tried in Boston, Massachusetts, on March 19-20, 2009. The stipulation of facts filed October 20, 2008, the supplemental stipulation of facts filed March 19, 2009, and the attached exhibits are incorporated herein by this reference. At the time Mr. Enayat filed his petition in docket No. 1488-07, he resided in Massachusetts. At the time Woodbury filed its petition in docket No. 1489-07, it was no longer actively engaged in business but had an address in Massachusetts.

Background

Mr. Enayat began working in the Persian rug business when he was 18 years old, and he owned his own store from 1994 through the date of trial. During each of the years at issue, Mr. Enayat was in the business of selling Persian rugs from a retail store in Bedford, New Hampshire. During taxable years 1998 and 1999, Mr. Enayat operated and was the sole shareholder of Woodbury, a

C corporation.  Towards the end of 1999, Mr. Enayat formed a limited liability company known as Sutter & Hayes, LLC (Sutter), and began operating his business through this entity.  During the years 1999 through 2001, Mr. Enayat was the sole member of Sutter.  Mr. Enayat maintained various bank accounts in his own name and in the names of Woodbury and Sutter.  However, in the manner described below, business receipts were sometimes deposited in personal accounts, and money was transferred between business and personal accounts without documentation being maintained to justify or explain the transfers.  Mr. Enayat admits, "I treated both myself and Woodbury, and [his investment accounts at] Oppenheimer, and Merrill Lynch, and Citibank and -- I treated it all as one."

Unreported Income of Woodbury

As a retail seller of Persian rugs, Woodbury acquired rugs from wholesale vendors and then sold them to its own customers, making its money from those sales.  Petitioners--Mr. Enayat and Woodbury--did not offer into evidence any records of Woodbury sufficient to show the amount of its sales in 1998 or 1999.  Woodbury reported gross sales receipts of $1,168,759 on its return for 1998, but at trial Mr. Enayat did not explain how he had arrived at this figure; and Woodbury's return preparer testified that he did not recall what he was given to support the

sales total.  For 1999 Woodbury did not file a return and therefore did not report receipts in any amount for that year.

In its examination, the IRS performed a bank deposits analysis to determine the amount of Woodbury's gross receipts for 1998 and 1999.  The IRS began with the gross deposits into Woodbury's bank accounts and reduced them by any identifiable non-taxable[5] item (e.g., cash deposits,[6] transfers between accounts, deposits whose source could not be identified or which were not readily apparent as business receipts, insurance proceeds, and returned checks) to get net taxable deposits.  The IRS then added to the net deposits all the checks payable to Woodbury that were deposited in Mr. Enayat's personal account (discussed infra beginning at page 10 as "diverted" checks) because those checks should have been deposited into Woodbury's accounts (and thereby should have shown up as gross receipts).

---

[5]The IRS classified as "non-taxable" the money flowing into Sutter's accounts that should have been excluded from gross receipts for various reasons (e.g., receipts that were actually non-taxable, receipts that should be excluded to avoid double counting, and unidentified money).  However, that classification does not necessarily mean that all items excluded from Woodbury's gross receipts under the IRS's method were non-taxable under the Internal Revenue Code.

[6]Excluding cash deposits was appropriate to the extent that the cash might have been obtained by cashing checks that had already been counted, or by withdrawing the cash from another bank account whose deposits had already been counted.  However, cash deposits might also have resulted from cash sales, so the exclusion of all cash deposits may be unduly favorable to Woodbury where cash sales are a possibility, but the IRS's analysis gives Woodbury the benefit of this doubt.

However, to accurately reflect Woodbury's gross receipts, the IRS then reduced its calculation for any transfers Mr. Enayat made from his personal accounts to Woodbury's corporate accounts, so as to prevent double-counting or the taxing of any clearly non-taxable items. These reductions included money flowing from Mr. Enayat to Woodbury that were capital contributions, see infra note 34, or that were transfers from Mr. Enayat to repay diverted Woodbury checks that Mr. Enayat had deposited in his personal account, since the diverted checks had already been added to net deposits.

By its bank deposits analysis, the IRS determined that Woodbury had additional gross receipts in taxable year 1998, as follows:

| Bank Account | Gross Deposits | Non-Taxables | Net Deposits |
|---|---|---|---|
| Fleet Bank Account No. 9632 | $162,289.53 | $151,743.53 | $10,546.00 |
| Granite Bank Account No. 0540 | 778,408.49 | 611,664.78 | 166,743.71 |
| Bank of NH Account No. 7435 | 2,193,660.33 | 1,271,624.11 | 922,036.22 |
| Granite Bank Account No. 0492 | 145,074.14 | 31,520.98 | 113,553.16 |
| Total | 3,279,432.49 | 2,066,553.40 | 1,212,879.09 |
| Less: Gross receipts per 1998 Form 1120 | | | (1,168,759.00) |
| Unreported gross receipts | | | 44,120.09 |
| Plus: Diverted checks | | | 203,273.00 |
| Total unreported gross receipts for 1998 | | | 247,393.09 |

As is shown above, that $247,393 represents the difference between Woodbury's reported gross receipts on its 1998 Form 1120, U.S. Corporation Income Tax Return, and the net taxable deposits as calculated in the IRS's bank deposits analysis, plus the checks made out to Woodbury and diverted into Mr. Enayat's personal accounts (which should have been deposited into Woodbury's accounts but were not). We find that the IRS's analysis was reasonable and that Woodbury had additional receipts of $246,352.[7]

The IRS did an equivalent analysis for 1999. For that year Woodbury had failed to file its Form 1120, so there is no Woodbury-generated number against which to compare the IRS's analysis. As it had for 1998, the IRS totaled Woodbury's gross deposits for 1999, reduced them by any identifiable non-taxable item (including any transfers from Mr. Enayat's personal accounts), and then added any Woodbury checks that Mr. Enayat had deposited into his personal account, yielding the following sum:

---

[7]In preparation for trial, respondent had an IRS revenue agent prepare another bank deposits analysis. This second bank deposits analysis revealed that Woodbury had additional gross receipts of $247,393.09 in taxable year 1998 instead of the additional $246,352 previously determined. However, respondent never accounted for this difference, so we find that Woodbury had additional receipts in the year 1998 in the lesser amount of $246,352, as reflected on the notice of deficiency.

| Bank Account | Gross Deposits | Non-Taxables | Net Deposits |
|---|---|---|---|
| Bank of NH | | | |
| Account No. 7435 | $347,489.73 | $244,918.77 | $102,570.96 |
| Fleet Bank | | | |
| Account No. 9632 | 205,358.91 | 177,602.46 | 27,756.45 |
| Total | 552,848.64 | 422,521.23 | 130,327.41 |
| Plus: Diverted checks | | | 31,723.00 |
| Total unreported gross receipts for 1999 | | | 162,050.41 |

Again, because we find the IRS's bank deposits analysis to be reasonable, and because Mr. Enayat has not introduced any evidence to refute those findings, we find that Woodbury had unreported gross receipts of $162,050 for taxable year 1999.

Diverted Woodbury Checks Deposited Into Mr. Enayat's Accounts

As was noted above, in 1998 and 1999 Mr. Enayat deposited into his personal bank accounts checks that were made out to Woodbury. He argues that these deposits are not taxable to him because they were made--and were repaid--pursuant to a procedure dictated by business necessity, arising from the manner in which he purchased rugs for resale. Mr. Enayat testified that he regularly went to New York, picked out the merchandise he wanted to buy for Woodbury, and negotiated a price and term for payment. The payments Woodbury owed to the vendors were usually due 90, 120, or 180 days after the date of sale. He wrote a Woodbury check to the vendor for the purchase price, post-dated the check to correspond to the payment term (e.g., if payment was due in 90

days, he would post-date the Woodbury check by 90 days), and took the merchandise with him.

However, Mr. Enayat testified that he learned that vendors would often try to cash or deposit these post-dated checks before their date, and that if there were sufficient funds in the Woodbury account, the bank would usually honor the check even though it was post-dated.[8]  He says that, in order to avoid the premature negotiation of the Woodbury checks, he adopted the practice of delaying the deposit of sufficient funds into the Woodbury account on which the check was drawn until the day before the post-dated check would mature.

In the meantime, however, Mr. Enayat wanted to negotiate promptly the corresponding checks that had been written to Woodbury by its customers.  He testified that since he did not want to put the funds into the Woodbury account, he would deposit checks from Woodbury customers into his personal accounts, as a sort of escrow, to be held there until he transferred the funds to the Woodbury account in order to cover the post-dated checks as they came due.  Thus, Mr. Enayat contends that the presence of

---

[8]Consistent with Mr. Enayat's account, it appears that under New Hampshire law (where Woodbury did its banking), a bank may honor a post-dated check unless its customer provides the bank reasonable advance notice of the post-dating and describes the check with reasonable certainty.  N.H. Rev. Stat. Ann. 382-A:4-401(c) (Butterworth 1994).

the deposits in his personal accounts was an accommodation to Woodbury, and not an appropriation of Woodbury funds.

Mr. Enayat's explanation seems superficially plausible for tax year 1998 in the aggregate--since he diverted $203,273 of Woodbury's checks but redeposited almost the same amount ($201,950) into Woodbury's account. However, in 1999 he did not redeposit any of the $31,723 he diverted from Woodbury. Moreover, even for 1998 the more detailed facts do not line up with his story but rather include these six anomalies and contradictions:

First, Mr. Enayat's alleged plan of depositing money into the Woodbury account only as the post-dated checks came due would have required him to maintain a rather sophisticated system to anticipate the negotiation of each post-dated check and to keep in the account just enough money--but no more--to cover the checks as they came due. Mr. Enayat offered no evidence of any such system, and he made no showing that the deposits into this account actually corresponded to the post-dated due dates of the checks. Instead, it appears that Mr. Enayat wrote checks on Woodbury's account (for anything and everything, including but not limited to the post-dated vendor checks, as we show below) until the account became overdrawn; and that he would then deposit enough money back into the account to bring the balance back into the black.

Second, Mr. Enayat gave no explanation for how his system could actually have achieved its supposed goal even if he had been able somehow to keep track of his check dates and make deposits to cover the checks only as they became due. If vendors really did tend to present checks prematurely, and if the bank did honor prematurely presented checks, then there would be no way to assure that the funds he carefully deposited would be used to pay the anticipated and timely presented check rather than an unanticipated but prematurely presented check. If funds were in the account but a premature check arrived that the bank honored, then a timely submitted check presented thereafter would bounce.

Third, although Mr. Enayat's testimony suggested that premature negotiation of checks was a persistent risk in his business, most of the Woodbury checks deposited into his personal accounts were in fact deposited in February and March 1998, and the deposits largely tailed off thereafter. The record includes no information to the effect that the situation changed, and no explanation for this irregularity.

Fourth, the purpose Mr. Enayat alleges would have naturally called for the use of a single account, from which funds could be swept as necessary. But throughout 1998 Mr. Enayat diverted Woodbury checks into not one but four separate personal accounts (acct. Nos. 0495, 4702, 1027, and 9215). If Mr. Enayat had truly

intended to hold these checks in a sort of escrow, there would have been no reason to deposit these checks in multiple accounts.

Fifth, on the other hand, the money Mr. Enayat redeposited into Woodbury's account did not come from all four of those personal accounts into which Woodbury checks had been deposited, but rather only two of them (i.e., acct. Nos. 0495 and 1027). If Mr. Enayat's story were true, he would have redeposited money from all four of the accounts to which it had been diverted, but he did not. Furthermore, from one of those personal accounts-- No. 1027--Mr. Enayat redeposited $36,500 into Woodbury's account even though he had diverted only $3,094 into that account in the first place. Even if Mr. Enayat could logically explain the necessity of using multiple accounts in this manner, the money flowing back to Woodbury should have been equivalent to the money diverted, not just in the aggregate, but account-for-account. It was not.

Sixth, the transaction history of Woodbury's corporate account No. 0540 simply fails to correspond to Mr. Enayat's story. While Woodbury did maintain a low or negative balance in this account at most times (which would seem to support Mr. Enayat's story), a review of the account statements shows that Mr. Enayat also used this account to pay personal expenses and to buy stock options. Had Mr. Enayat truly been holding these diverted checks in escrow to prevent the premature

depositing of post-dated checks, he would have needed to keep the balance of Woodbury's account near zero and would have used the account only for these post-dated check transactions. Using the account as a general checking account--and depositing in it funds that were intended to cover other expenses--would (if his story were true) enable a rug business payee to raid these other moneys that were put into the account. If Mr. Enayat really had run his accounts in the manner he alleged with the purpose of preventing depletion of Woodbury funds by premature negotiation of Woodbury checks, he would not have put non-Woodbury money at the same risk.

The evidence does not show that Mr. Enayat held the proceeds from Woodbury checks in an escrow-like fashion or used his personal account to "sweep" these diverted checks in any orderly fashion. We find that he did not do so, but simply deposited Woodbury checks into his personal accounts for general use.

Mr. Enayat did not treat any of the diverted Woodbury checks as income on his own Form 1040, U.S. Individual Income Tax Return, for 1998 or 1999. In its notice of deficiency, the IRS effectively treated each Woodbury check deposited in a personal account as if it were a constructive dividend to Mr. Enayat;[9] and

---

[9]The IRS's notice of deficiency characterized the income Mr. Enayat derived from depositing Woodbury checks as dividend
(continued...)

the IRS did not reduce its adjustment by the equivalent amounts that Mr. Enayat had transferred to Woodbury during 1998.[10]

Transfers From Woodbury to Mr. Enayat

In addition to the Woodbury checks deposited by Mr. Enayat into his personal accounts, Woodbury made transfers of funds to Mr. Enayat throughout 1998 and 1999. Woodbury transferred $349,356 to Mr. Enayat in 1998 and $67,200 in 1999, either by checks written to Mr. Enayat or by direct transfers. Mr. Enayat did not report any of these amounts as income on his Forms 1040, because (he says) he considered them to be repayments of loans he had previously made to Woodbury. He testified that he advanced funds to Woodbury when the business needed them to cover expenses or inventory, or whenever there were cash flow problems for

---

[9](...continued)
income. Although Mr. Enayat disputed the characterization of these amounts as income to him, he did not offer any evidence to show that, if income, they were officer's compensation rather than dividends. Consequently, because we find that these amounts were income to Mr. Enayat, we accept the IRS's characterization as dividend income.

[10]As is explained supra p. 7, for purposes of calculating Woodbury's taxable income the IRS added the amounts of these diverted checks to Woodbury's gross receipts. However, Wood-bury's gross bank deposits included transfers from Mr. Enayat, some of which remitted to Woodbury the proceeds of the diverted checks. To avoid double-counting the diverted checks as Woodbury income, the IRS subtracted from Woodbury's net deposits Mr. Enayat's transfers that remitted the amounts of the diverted checks. Thus, these amounts were treated only once as taxable income to Woodbury. They were also treated as taxable income to Mr. Enayat. This double taxation--of the corporation and the shareholder--is discussed infra pt. II.A.1.

Woodbury. And he insisted that all the money transferred from Woodbury to his personal accounts in 1998 and 1999 was for the repayment of these types of loans; that for every transfer from Woodbury to Mr. Enayat (i.e., the repayment) there would have been a preceding transfer from Mr. Enayat to Woodbury (i.e., the loan); and that Woodbury repaid the loans to him as funds became available. The evidence does show--broadly consistent with this account--that Mr. Enayat did make transfers[11] to Woodbury from his personal accounts in amounts totaling $346,238.11[12] in 1998 (when the Woodbury-to-Enayat transfers totaled $349,356) and totaling $164,429.17 in 1999 (when the Woodbury-to-Enayat transfers totaled only $67,200). These, he says, were the loans for which Woodbury repaid him with the transfers now at issue, and the two-year total of these Enayat-to-Woodbury transfers did substantially exceed the amounts of the Woodbury-to-Enayat transfers.

---

[11]There is no indication of how the IRS classified the money flowing from Mr. Enayat to Woodbury, but we assume it was treated as contributions to capital.

[12]These 1998 transfers totaling $346,238 were in addition to the transfers in that year totaling $201,950 (see supra p. 12), a few from account No. 1027 and most from account No. 0495, by which Mr. Enayat transmitted to Woodbury the amounts of the Woodbury checks that he had deposited in his personal accounts. In the aggregate, Mr. Enayat's transfers to Woodbury in 1998 and 1999 totaled $712,617 (i.e., $346,238 plus $164,429 plus $201,950).

However, there were no notes or loan agreements executed between Mr. Enayat and Woodbury for any of these alleged loans, and he could point to no entries in corporate minutes or corporate financial records reflecting any such loans. Mr. Enayat did not charge Woodbury interest on these loans or set any maturity dates. Moreover, his assertion that the Woodbury-to-Enayat transfers were always preceded by Enayat-to-Woodbury transfers is not supported by the evidence. When pressed about a specific transaction in which $10,000 seemed to go first from Woodbury to Mr. Enayat, he admitted that it is possible that Woodbury might have lent <u>him</u> money, and that a <u>later</u> $10,000 Enayat-to-Woodbury transfer may have been a repayment by Mr. Enayat of a loan made by Woodbury. The Court invited Mr. Enayat to present in his post-trial brief a detailed analysis of the bank records to show (if he could) that each Woodbury-to-Enayat transfer was preceded by an Enayat-to-Woodbury loan; but he did not do so, and instead limited his presentation to the aggregate numbers. At one point in the trial, Mr. Enayat candidly testified that he just treated himself, Woodbury, and all the bank accounts as one, and we find that to be true. He did not have a practice or routine that suggests that the Woodbury-to-Enayat transfers were repayments of prior bona fide

loans.  We therefore find that these amounts were additional officer's compensation to Mr. Enayat.[13]

Unreported Income of Sutter in 1999 and 2000

Sometime in 1999 Mr. Enayat formed Sutter & Hayes as a single-member LLC and began to operate his rug business through this entity.  On the Schedule C, Profit or Loss From Business, for Sutter attached to Mr. Enayat's 1999 Form 1040 he did not report any gross receipts for Sutter.  However, the IRS performed a bank deposits analysis on the bank accounts of Sutter to determine Sutter's gross receipts for 1999 and 2000,[14] and the analysis disclosed two deposits in 1999.  Mr. Enayat has now stipulated that Sutter received two customer checks during taxable year 1999 totaling $1,228 which were deposited into Sutter's bank account.  We find that these checks constituted gross receipts that were taxable in 1999.

In 2000 Mr. Enayat maintained a detailed sales report for Sutter, which purported to list the date of every sale Sutter made with the corresponding customer's name and the amount of the

[13]The IRS's notice of deficiency issued to Mr. Enayat characterized Woodbury's transfers to him as officer's compensation.  Although Mr. Enayat disputed the characterization of these amounts as income to him, he did not offer any evidence to contend that, if income, they were anything other than officer's compensation.  Consequently, because we find that these amounts were income to Mr. Enayat, we accept the IRS's characterization as officer's compensation.

[14]The record does not show whether the IRS performed a bank deposits analysis for Sutter for its 2001 year.

sale.  Sutter's 2000 gross receipts as recorded on the detailed sales report totaled $691,170.  Mr. Enayat alleges that the detailed sales report is a complete list of all sales for Sutter in 2000, and that it therefore represents Sutter's entire gross receipts for 2000.  Mr. Enayat reported the gross receipts of Sutter to be $671,920[15] on his 2000 Form 1040.

However, the totals reflected on the sales report and reported on the return were not consistent with the information that Sutter included on its claim for business interruption insurance.  In making that claim Sutter reported that, in the 23 weeks preceding the flood that interrupted its business, it had average weekly sales of $30,099.  The 23-week total was therefore $692,277--a part-year total that already exceeded the gross receipts Sutter reported for its full year.  Clearly Sutter's insurance claim left Mr. Enayat with much explaining to do and rendered the sales report suspect.

To determine the correct figure for Sutter's gross receipts in 2000, the IRS conducted a bank deposits analysis.  Its agent totaled the deposits made into Sutter's accounts in that year and reduced that amount by any identifiable "non-taxable" item (e.g., transfers between accounts, cash deposits, returned checks,

[15]Mr. Enayat did not explain the $19,250 difference between the gross sales of $691,170 reported on the detailed sales report and the gross receipts of $671,920 reported on Mr. Enayat's Schedule C.

refunds, and any unidentifiable deposits) to calculate Sutter's net taxable deposits. Bank deposits do not reflect all of Sutter's revenues because, as Mr. Enayat stipulated, some of Sutter's receipts for 2000 were never deposited into a Sutter account or in any of Mr. Enayat's personal accounts.[16] For that reason the IRS compared Mr. Enayat's detailed sales report--on which Mr. Enayat supposedly recorded every sale Sutter made--to actual deposits made into the known accounts. Any customer payment appearing on the detailed sales report that did not have a corresponding deposit into a Sutter account or one of Mr. Enayat's personal accounts was added to Sutter's net taxable deposits to account for total gross receipts for 2000.[17] The IRS also made an adjustment to account for Sutter's accounts receivable at the beginning of 2000 compared to the end of 2000,

---

[16]Mr. Enayat stipulated that $428,637.83 in payments received from customers of Sutter was never deposited into a Sutter account or in any of Mr. Enayat's personal accounts. Undeposited checks totaling this amount were either cashed or endorsed over to Sutter's creditors.

[17]Where no corresponding deposit could be found for a reported sale, and where the transaction did not involve the exchange of money (e.g., an October 14, 2000, entry of $8,560 for K.N.C. Investments, where Sutter exchanged a rug for the payment of rent), the IRS added that sale to Sutter's gross receipts. We find no fault with this approach. The value that Sutter received in kind in exchange for a rug should have been included in gross receipts. At best there might have been an occasion for an offset (e.g., as a cost of goods sold or as a deduction for the rent for which the rug was payment), but Mr. Enayat did not show that the offset had not already been claimed, and he did not allege or prove his entitlement to further deductions or costs of goods sold.

because Sutter had used an accrual method of accounting. On the basis of this analysis the IRS determined that Mr. Enayat had understated Sutter's gross receipts for 2000 by $252,722.08, and we find that this determination was not refuted.

Money Dr. Willitts Entrusted to Mr. Enayat

On July 13, 1998, Mr. Enayat received, in his Oppenheimer investment account, a wire transfer of $455,485 from a Cayman Islands account controlled by Dr. William Willitts. Mr. Enayat testified that Dr. Willitts entrusted this money to Mr. Enayat pursuant to an arrangement used by Iranian-Americans because it is impractical or impossible to transfer dollars from the United States to Iran. A practice has developed under which a transfer is made indirectly by paying dollars to an American who has a friend or relative in Iran, and then having the American direct his friend or relative to make an equivalent transfer in rials (the Iranian currency) to the ultimate payee in Iran. Dr. Willitts paid Mr. Enayat $455,485 in the United States with the understanding that the equivalent amount in rials would be made available to Dr. Willitts in Iran from the proceeds of the sale of property owned by Mr. Enayat's family in Iran. Dr. Willitts never made it to Iran and never received the equivalent of $455,485 in rials.

Mr. Enayat testified that once Dr. Willitts wired the funds into his account, Mr. Enayat had free use of the money.

Dr. Willitts expected Mr. Enayat or his family in Iran to provide rials in Iran to Dr. Willitts from the proceeds of an unrelated real estate transaction; he did not expect Mr. Enayat to purchase rials with the dollars wired into the Oppenheimer investment account. Mr. Enayat used some of the money to fund his business and the rest for options trading. By April 30, 1999, the balance of Mr. Enayat's Oppenheimer account was zero, indicating that Mr. Enayat had spent, transferred, or lost (through diminution in the value of the securities he held) all of the funds in that account, including Dr. Willitts's money.

At some point Dr. Willitts's wife, Dr. Roofeh (who is Mr. Enayat's friend), asked Mr. Enayat for $54,000 in the United States, and Mr. Enayat promptly returned that portion of the $455,485. Subsequently, Mr. Enayat paid additional sums to or at the direction of Dr. Willitts, and he testified that he had returned a total of $270,000 as of the date of trial. However, there is a dispute over how much Mr. Enayat repaid. An Agreement and Release which Mr. Enayat, Dr. Willitts, and Dr. Roofeh each signed in November 1999 characterizes the $454,000 as a debt owed to Dr. Willitts by Mr. Enayat, and it identifies a dispute in which Mr. Enayat claimed he owed $285,000, and Dr. Willitts claimed the outstanding debt was $305,000. Dr. Willitts filed a Petition for Ex Parte Attachment and Trustee Process in the Hillsborough County (New Hampshire) Superior Court on or about

December 17, 1999, in which he alleged that Mr. Enayat had repaid $148,899 of the total sum due of $454,000, and alleged a balance due of $305,101.[18] Dr. Willitts's petition does not allege theft, conversion, embezzlement, or misappropriation. On the record before us, there is no evidence of any wrong by Mr. Enayat in receiving or using Dr. Willitts's money. The only wrong even alleged is his failure to pay the money back after the parties could not conclude the intended transactions in Iran.

Mr. Enayat alleges that he has repaid the much greater amount of $310,000--i.e., $270,000 in cash and rugs plus $40,000 from the settlement on the building where Sutter was located-- leaving a balance due of approximately $145,000. However, Mr. Enayat did not provide any evidence other than his own testimony to substantiate the repayment of $310,000 of the money Dr. Willitts transferred to him. As a result, to the extent that such a finding is needed, we find that, at most, Mr. Enayat had repaid $148,899 (the amount Dr. Willitts conceded in his petition).

Mr. Enayat did not report the receipt of the $455,485, or any portion thereof, on his Form 1040 for 1998 (or any other year at issue). The IRS determined that Mr. Enayat had repaid a

---

[18]The record does not indicate why the amount recited in the Agreement and Release was $454,000 or why Dr. Willitts indicated in his petition that the total balance he entrusted to Mr. Enayat was $454,000 instead of the $455,485 he wired to Mr. Enayat's account.

portion of the money owed to Dr. Willitts, but to the extent Mr. Enayat had failed to repay the money--$305,101--the notice of deficiency referred to it as "income from theft" and "embezzled funds" income to Mr. Enayat.[19]

Mr. Enayat contends that respondent is estopped from asserting that he embezzled money from Dr. Willitts because, in a criminal case against Dr. Roofeh,[20] the Government called Mr. Enayat as a witness in 2001 and evoked testimony from him to the effect that he did not take or steal the money that Dr. Willitts had transferred to him.  However, without finding that the Government is estopped from asserting that Mr. Enayat stole the money,[21] we simply find on the preponderance of the

---

[19]Although respondent concedes that some of the money Mr. Enayat repaid to Dr. Willitts may have been repaid in years later than taxable year 1998, the adjustment to Mr. Enayat's income nets the alleged embezzlement and all the repayments as if they happened in taxable year 1998, evidently for the sake of simplicity.

[20]United States v. Roofeh, No. 1:00CR00112 (D. N.H. dismissed Feb. 28, 2001).

[21]Mr. Enayat's estoppel argument is not well grounded.  To be judicially estopped, the Government "must have succeeded in persuading a court to accept its prior position", Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004), but Mr. Enayat has not shown that in the Roofeh case the Government actually took the position that he did not commit theft or that it succeeded in persuading the Court to accept that position.  Mr. Enayat cites United States v. Kattar, 840 F.2d 118, 128 (1st Cir. 1988)(quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)), for the inapposite proposition that "conviction must fall when the prosecution, 'although not soliciting false evidence, allows it to go uncorrected when it appears'".

(continued...)

evidence that Mr. Enayat received the money not by theft or misappropriation but in the transaction that he described.  We find that he therefore owed a debt to Dr. Willitts in that amount, and during the years at issue the money Dr. Willitts had transferred to Mr. Enayat and that Mr. Enayat had yet to repay remained a debt that Mr. Enayat continued to owe Dr. Willitts.

Sale of the Elm Street Property

Until early May 1998, Mr. Enayat rented and resided in a house on Elm Street in Manchester, New Hampshire.  He moved out in May 1998;[22] and about two months later on July 24, 1998, he purchased the Elm Street house for $210,000 as an investment. After Mr. Enayat bought the house in July, he began renovating it; and he sold the house five months later on December 30, 1998, for $274,000.  That the renovation occurred is established not

---

[21](...continued)
(Emphasis added.)  We cannot tell, but perhaps that proposition could have been helpful to the criminal defendant who was being prosecuted in Roofeh.  However, this deficiency case in the Tax Court is not a criminal case; Mr. Enayat is not being prosecuted; and his complaint is not that the Government relies here on "false evidence" but that it attempts to contradict Mr. Enayat's testimony that (he insists) constituted true evidence in another case.  Kattar has no application here.

[22]Respondent called Mr. Enayat's former girlfriend as a witness at trial to testify that Mr. Enayat had lived at the Elm Street property from July to December 1998 (i.e., after Mr. Enayat had purchased the house).  However, when pressed on this issue, the witness admitted that she may have been confusing December 1997 with December 1998.  We find that Mr. Enayat did not reside at the Elm Street property after he purchased it in July 1998.

only by Mr. Enayat's testimony but also by the fact that the December 1998 sale price was $64,000 higher than Mr. Enayat's July 1998 purchase price. However, at trial he offered no substantiation for any expenditures incurred in the renovation, and he gave only the most general testimony about the nature of the renovation.

On his 1998 return Mr. Enayat reported $71,812 in capital gains from securities transactions and a $118,619 capital loss identified as "Investment Property/House". To compute this loss, we assume that Mr. Enayat included the supposed cost of renovations in his basis for the house. (With a purchase price of $210,000 and a sale price of $274,000, it would have taken more than $182,000 in renovation costs to yield a loss of $118,619. Mr. Enayat did not substantiate costs of $182,000 or any other amount.) Mr. Enayat fully offset his 1998 capital gain of $71,812 with his purported real estate capital loss. He entered a $3,000 capital loss on line 13 of his 1998 Form 1040, but because he reported negative adjusted gross income, he did not actually obtain the benefit of any deduction for capital loss for 1998. Rather, Mr. Enayat carried forward a $46,807 capital loss (i.e., $118,619 minus $71,812), and he used that amount to offset some of his $338,202 net capital gains in 1999.[23]

_____

[23]The parties stipulated that Mr. Enayat claimed his purported $118,619 real estate capital loss by claiming $74,812
                                                          (continued...)

In the notice of deficiency the IRS disallowed these capital loss deductions for both 1998 and 1999. We find that Mr. Enayat substantiated his purchase price of $210,000 but not any additional basis derived from renovations, and that therefore he did not prove his capital loss.

Mr. Enayat's Concessions

Mr. Enayat conceded the following four matters:

1. Gambling Income. During taxable year 1998 Mr. Enayat received gambling income of $16,800 from Foxwoods Casino. Mr. Enayat did not report the receipt of this gambling income on his 1998 Form 1040. Mr. Enayat does not dispute that he received this income or that it should have been reported on his 1998 Form 1040.

2. Rental Income. During taxable year 1998 Mr. Enayat received rental income of $2,000 from Shorty's Mexican Roadhouse. Mr. Enayat did not report the receipt of this rental income on

---

[23](...continued)
of the loss in 1998 and carrying $46,807 of the loss forward into 1999. The sum of these amounts is $121,619, not $118,619; and the $74,812 stipulated as claimed in 1998 appears mistakenly to include the $3,000 Mr. Enayat entered on line 13 of his Form 1040 but that he was unable to deduct. We may disregard stipulations between parties where justice requires, if the evidence contrary to the stipulation is substantial or the stipulation is clearly contrary to facts disclosed by the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989); Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976). The tax returns show that Mr. Enayat applied $71,812 (not $74,812) to offset capital gains in 1998 and $46,807 to offset net capital gains in 1999, totaling $118,619 (not $121,619).

his 1998 Form 1040. Mr. Enayat does not dispute that he received this income or that it should have been reported on his 1998 Form 1040.

3. <u>Insurance Proceeds</u>. During taxable year 2000 Sutter was unable to operate for a time because of a flood in the building. In July 2000 Mr. Enayat filed an insurance claim and received business interruption insurance payments of $201,929 from Safeco Insurance Co. (Safeco). (As to the amount, see <u>infra</u> note 29.) Mr. Enayat did not report the receipt of these insurance proceeds on his 2000 Form 1040. Mr. Enayat does not dispute that he received this income or that it should have been reported on his 2000 Form 1040.

4. <u>Stolen Check</u>. During taxable year 2001 Mr. Enayat received a Bank of America check in the amount of $113,800, which was from a company called QAD, Inc., and issued to Innuendo, LLC. Mr. Enayat misappropriated the funds by negotiating the check with the help of a friend, and he was convicted of receipt of stolen securities under 18 U.S.C. section 2315 in the U.S. District Court for the District of New Hampshire. Mr. Enayat did not report the receipt of the $113,800 on his 2001 Form 1040, and he does not dispute that this $113,800 should have been reported as gross receipts on his 2001 Schedule C.

Mr. Enayat's Federal Income Tax Returns and the Results of the IRS's Examination

A.    Taxable Year 1998

Mr. Enayat filed his Form 1040 for taxable year 1998 a year late on April 14, 2000.  He reported no wage or salary income. He claimed a capital loss of $71,812 from the sale of real estate (the Elm Street property) and carried over $46,807 to his 1999 Form 1040.  As a result, he reported no taxable income for 1998. After examining Mr. Enayat's 1998 return, the IRS made the following adjustments to his income:

(1)    a $74,812 increase in taxable income, arising from the disallowance of a capital loss with respect to the sale of the Elm Street property;

(2)    a $16,800 increase in taxable income derived from gambling;

(3)    a $349,356 increase in officer's compensation income, to account for transfers of money from Woodbury's accounts to his personal accounts;

(4)    a $305,101 increase in taxable income, to account for the transfer from Dr. Willitts;

(5)    a $203,273 increase in constructive dividend income, to account for checks made out to Woodbury but deposited into his personal accounts;

(6)    a $2,000 increase in taxable rental income; and

(7)    an $8,100 increase in taxable income, resulting from the disallowance of personal exemptions because of Mr. Enayat's corrected adjusted gross income (AGI) resulting from the adjustments above.

B.    Taxable Year 1999

Mr. Enayat filed his Form 1040 for taxable year 1999 on October 9, 2002.  He reported no wage or salary income, and he claimed the capital loss of $46,807 that was carried over from his 1998 Form 1040.[24]  He attached to his 1999 return a Schedule C for Sutter.  He reported that Sutter had no gross receipts in 1999 but that it had $38,024 in expenses, resulting in a claimed loss of $38,024 from Sutter.  He reported taxable income of $234,688.  Following an examination of Mr. Enayat's 1999 return, the IRS made the following adjustments to his income:

(1)   a $46,807 increase in taxable income, arising from the disallowance of a capital loss with respect to the sale of the Elm Street property;

(2)   a $85,200[25] increase in officer's compensation income, to account for transfers of money from Woodbury's accounts to his personal accounts;

(3)   a $31,723 increase in constructive dividend income, to account for checks made out to Woodbury but deposited into his personal accounts;

(4)   a $1,228 increase in the gross receipts reported on his Schedule C, to reflect Sutter's correct gross receipts; and

(5)   a $5,184 increase in taxable income, resulting from the disallowance of itemized deductions because of

---

[24]Mr. Enayat also had other capital gains and losses that resulted in his claiming a total capital gain of $291,395 on his 1999 return.

[25]The IRS later determined--and has conceded in this case-- that the actual amount of Woodbury-to-Enayat transfers was $67,200.  See supra note 3.

Mr. Enayat's corrected AGI resulting from the adjustments above.

C.   Taxable Year 2000

Mr. Enayat filed his Form 1040 for taxable year 2000 on October 22, 2002.  He reported no wage or salary income.  He attached to his 2000 return a Schedule C for Sutter.  He reported that in 1999 Sutter had gross receipts of $671,920 but had $332,159 in cost of goods sold plus $457,826 in additional expenses, resulting in a claimed loss of $118,065 from Sutter. He reported zero taxable income.  After examining that return, the IRS made the following adjustments to his income:

   (1)   a $201,929 increase in taxable income to account for the receipt of insurance proceeds;

   (2)   a $252,721 increase in the gross receipts reported on his Schedule C, to reflect Sutter's correct gross receipts;

   (3)   a $9,232 decrease in taxable income, to allow the increased deduction for one-half of Mr. Enayat's self employment tax;[26]

   (4)   an $11,169 increase in taxable income, resulting from the disallowance of itemized deductions because of Mr. Enayat's corrected AGI resulting from the adjustments above; and

   (5)   a $2,800 increase in taxable income, resulting from the disallowance of personal exemptions because of

---

[26]Because Mr. Enayat's self-employment (Schedule C) income increased, so did his self-employment tax.  That self-employment tax increase is not reflected on the adjustments to Mr. Enayat's income, but his deduction for one-half of that higher amount is. Although Mr. Enayat challenges the IRS's year 2000 income adjustment, he did not offer any argument that the amount, if income, should not be characterized as self-employment income.

Mr. Enayat's corrected AGI resulting from the adjustments above.

D.  Taxable Year 2001

Mr. Enayat filed his Form 1040 for taxable year 2001 on October 22, 2002.  He reported no wage or salary income and reported a $30,059 loss from Sutter.  He reported no taxable income for 2001.  Following an examination of Mr. Enayat's 2001 return, the IRS made the following adjustments to his income:

(1)  a $113,800 increase in the gross receipts reported on his Schedule C, to include the amount of a stolen check; and

(2)  a $5,917 decrease in taxable income, to allow the increased deduction for one-half of Mr. Enayat's self employment tax.

Woodbury's Federal Income Tax Returns and the Results of the IRS's Examination

For the year 1998 Woodbury filed its Form 1120 more than four years late on September 10, 2003, reporting, inter alia, gross receipts of $1,415,111 and, after deductions, a net loss of $13,633.  After examination the IRS adjusted Woodbury's 1998 gross receipts upwards by $246,352.

For the year 1999 Woodbury filed no tax return.  After examination the IRS determined Woodbury's gross receipts--and its taxable income--to be $162,050 for 1999.

Although the IRS had determined that Mr. Enayat had received compensation from Woodbury of $349,356 in 1998 and $67,200 in 1999 (a correction from an earlier $85,200), the notice of

deficiency reflected no allowance of deductions for Woodbury in these amounts. (As we show infra in part I.B.3 and 4, if such deductions are allowed, the 1998 income adjustment is entirely offset and the 1999 income adjustment is offset in part.)

The Statutory Notices of Deficiency and the Commencement of These Cases

On October 17, 2006, the IRS mailed separate statutory notices of deficiency to Mr. Enayat and Woodbury. In Mr. Enayat's notice the IRS determined a deficiency based on the adjustments of income described above and also determined both additions to tax for his failure to timely file his returns and fraud penalties for taxable years 1998, 1999, 2000, and 2001. In Woodbury's notice the IRS determined deficiencies for taxable years 1998 and 1999 based on the adjustments to its gross receipts as described above and also determined additions to tax for its failure to timely file its tax return for taxable year 1998 and for its fraudulent failure to file for taxable year 1999 and a fraud penalty for taxable year 1998. Mr. Enayat and Woodbury both timely petitioned this Court for a redetermination of their respective deficiencies.

OPINION

I. Unreported Income of Woodbury and Sutter

Mr. Enayat operated his rug business through Woodbury in 1998 and 1999 and through Sutter in 1999 through 2001, kept sloppy records for both entities, and failed to report much of

their income.  Taxpayers bear the responsibility to maintain books and records that are sufficient to establish their income. See sec. 6001; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); sec. 1.446-1(a)(4), Income Tax Regs. (26 C.F.R.); see also Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Mr. Enayat failed to fulfill that responsibility both as to himself and as to his C corporation, Woodbury.

A.    The IRS's Use of the Bank Deposits Method

When a taxpayer fails to keep adequate books and records, the IRS is authorized to determine the existence and amount of the taxpayer's income by any method that clearly reflects income. Sec. 446(b); Mallette Bros. Constr. Co. v. United States, 695 F.2d 145, 148 (5th Cir. 1983); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81; see also Holland v. United States, 348 U.S. 121, 131-132 (1954).  The IRS's reconstruction of a taxpayer's income need only be reasonable in light of all surrounding facts and circumstances. Schroeder v. Commissioner, 40 T.C. 30, 33 (1963); see also Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970).  The IRS is given latitude in determining which method of reconstruction to apply when taxpayers fail to maintain adequate books and records. Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court; Kenney v. Commissioner, 111

F.2d 374, 375 (5th Cir. 1940), affg. a Memorandum Opinion of this Court; Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989).

In the instant cases, the IRS chose to apply the bank deposits method. A bank deposit is prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); see also Clayton v. Commissioner, 102 T.C. 632, 645 (1994); DiLeo v. Commissioner, supra at 868; Estate of Mason v. Commissioner, supra at 656. When a taxpayer keeps no books or records and has large bank deposits, the IRS is not acting arbitrarily or capriciously by resorting to the bank deposits method. DiLeo v. Commissioner, supra at 867. The bank deposits method of reconstruction assumes that all of the money deposited into a taxpayer's account is taxable income unless the taxpayer can show that the deposits are not taxable. See id. at 868; see also Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964). The IRS need not show a likely source of the income when using the bank deposits method, but the IRS must take into account any nontaxable items or deductible expenses of which the IRS has knowledge. See Price v. United States, supra at 677; Tokarski v. Commissioner, supra at 77.

Using the bank deposits method, the IRS identified unreported gross receipts for Woodbury for taxable years 1998 and 1999, as well as unreported gross receipts for Sutter (Mr. Enayat's LLC) for taxable years 1999 and 2000. As a general

rule, the IRS's determinations are presumed correct, and the taxpayer has the burden of establishing that the determinations in the notice of deficiency are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  As is explained above, we find that the IRS reasonably reconstructed petitioners' income under the bank deposits method for all the years in issue.

B.    Petitioners' Challenge to the Bank Deposits Analysis

Mr. Enayat contends that the IRS's bank deposits analysis is faulty.  The burden is on the taxpayer to show that the IRS's analysis is unfair or inaccurate.  Price v. United States, supra at 677.  Petitioners must show either that the IRS's computation of their income is inaccurate or that the deposits made into their bank accounts are not taxable.  See Marcello v. Commissioner, 380 F.2d 509, 511 (5th Cir. 1967), affg. T.C. Memo. 1964-303 and T.C. Memo. 1964-304; Price v. United States, supra at 678; DiLeo v. Commissioner, supra at 871.  We consider each of the years at issue, taking them out of order to begin with the year in which Mr. Enayat makes his most serious challenge.

1.  Sutter's Year 2000

For taxable year 2000 Mr. Enayat introduced a detailed sales report of Sutter which purported to list the date of every sale Sutter made with the corresponding customer's name and the amount of the sale.  Mr. Enayat alleges that the detailed sales report is a complete list of all sales for Sutter in 2000 and that it

therefore represents Sutter's gross receipts for 2000.
Mr. Enayat reported the gross receipts of Sutter to be $671,920[27]
on his 2000 Form 1040.  However, when the IRS completed its bank
deposits analysis of Sutter's bank accounts, it found that
Mr. Enayat had understated the LLC's gross receipts by
$252,722.08.

To determine the correct figure for Sutter's gross receipts
in 2000, the IRS performed a bank deposits analysis by looking at
the total deposits into Sutter's accounts and reducing that
amount by any identifiable non-taxable item (e.g., transfers
between accounts, cash deposits, returned checks, and tax
refunds) to get Sutter's net taxable deposits.  Because
Mr. Enayat has stipulated that some of Sutter's receipts for 2000
were never deposited into a Sutter account or in any of
Mr. Enayat's personal accounts,[28] the IRS then compared
Mr. Enayat's customer payment summary to actual deposits made
into the known accounts.  Any reported customer payment that did
not have a corresponding deposit into a Sutter account or one of
Mr. Enayat's personal accounts was added to Sutter's net taxable
deposits to account for total gross receipts for 2000.  The IRS

---

[27]The gross receipts as calculated on the detailed sales
report were $691,170.  As indicated supra note 15, Mr. Enayat did
not explain the difference between the gross sales reported on
the detailed sales report and the gross receipts reported on his
Schedule C.

[28]See supra note 16.

then made an adjustment to account for accounts receivable at the beginning of 2000 compared to the end of 2000 and for a deposit from Lynk Systems which was treated as non-taxable.  Following this methodology the IRS determined that Sutter had gross receipts of $924,624.55 for the year 2000.  Because Mr. Enayat reported Sutter's gross receipts to be $671,920.47 on his 2000 Schedule C, the IRS determined that Mr. Enayat understated Sutter's gross receipts for taxable year 2000 by $252,722.08.  We find the IRS's bank deposits analysis to be credible.  Therefore, the burden lies with Mr. Enayat to show any flaws in the IRS's methodology.  Price v. United States, supra at 677.

Mr. Enayat argues that the IRS's bank deposits analysis on Sutter's accounts is flawed because it included in gross receipts items that had otherwise been counted and should have been excluded to avoid double-counting--(i) insurance proceeds from Safeco that had already been attributed as income to Mr. Enayat and (ii) loans from third parties.  Furthermore, Mr. Enayat argues that he reported Sutter's gross receipts accurately because he reported the figure shown on the sales report which recorded every sales transaction.  We do not find any of Mr. Enayat's arguments to have merit.

First, Mr. Enayat alleges that the inclusion of the $266,652[29] of Safeco insurance proceeds in the IRS's bank deposits analysis for Sutter was wrong because the IRS had already counted those proceeds as income to him personally. That is, Mr. Enayat asserts that the IRS did not treat these Safeco deposits as non-taxable in its analysis and reduce the gross deposits by these amounts. He does not support this assertion by an analysis of the bank deposits or a detailed critique of the IRS's analysis, and the assertion is wrong as a matter of fact. Mr. Enayat deposited three checks from Safeco into Sutter's Fleet account No. 3078 totaling $226,652. In addition to these three checks, a fourth check from Safeco in the amount of $40,000 was evidently negotiated through a third party, so that $40,000 in Safeco insurance proceeds reached Sutter's accounts as a cash deposit. In its analysis of Fleet account No. 3078, the IRS determined that in 2000 there were gross deposits of $465,179.29 (presumably including the Safeco payments). Of that total, the IRS treated $322,327.88 as non-taxable items, leaving net taxable

---

[29]The record shows that $266,652 from Safeco was deposited into Sutter's Accounts. However, the parties have stipulated that the insurance proceeds Mr. Enayat received for business interruption in 2000 totaled $201,929. We do not attempt to resolve this unexplained discrepancy. Rather, we use the larger number when that favors Mr. Enayat (i.e., in his critique of the bank deposits analysis), and we use the smaller number when that favors Mr. Enayat (i.e., in accepting the stipulated smaller number as the amount of the income adjustment).

deposits of only $142,831.41, an amount too small to include the much larger Safeco proceeds.

The IRS specifically identified cash as a non-taxable item in its analysis. Therefore, the $40,000 cash portion of the Safeco payments was necessarily treated as non-taxable. Had the IRS failed to remove the insurance checks totaling $226,652 as non-taxable items, then the net deposit total for Fleet account No. 3078 would have had to include that amount, but it clearly does not. The net taxable deposits for Fleet account No. 3078 is only $142,831.41, which is much less than the $226,652 (or the $266,652 with the $40,000 cash deposit included) that Mr. Enayat accuses the IRS of ignoring, and thereby treating as taxable. The IRS treated $322,327.88 from this account as non-taxable items, and it was Mr. Enayat's burden to prove that the Safeco checks and cash were not among these items. He failed to do so.

Second, Mr. Enayat alleges that $200,168 of the deposits found in Sutter's accounts was not taxable income but rather was the proceeds of loans by third parties. However, other than his own testimony, Mr. Enayat provided no proof of these third-party loans--no loan documents of any kind, no testimony from any of the alleged lenders, and no minutes or financial entries reflecting such loans. None of the checks deposited from these third parties had any markings on them (such as the designation "loan" written on the front of the check) to indicate that they

were intended as loans. On the contrary, two of the pertinent checks had markings on them that indicate that they were <u>not</u> loans (i.e., one check for $10,000 had "9x13" written in the "memo" area, apparently indicating that the check was for the purchase of a 9- by 13-foot rug; and one wire transfer for $25,000 had "1982 Rolls Royce" written on it, indicating that the transaction involved a car). We find that Mr. Enayat has not provided credible evidence to prove that any loans were made and their proceeds deposited into Sutter's bank accounts in 2000, and we therefore find no fault in the IRS's declining to reduce net deposits to account for these unsubstantiated loans.

Third, Mr. Enayat argues that Sutter's gross receipts were not understated because he reported the gross receipts as shown on the sales report summary that (he says) recorded every sale. However, the gross receipts he reported did <u>not</u> correspond precisely to the total amount on the sales report; and more important, Sutter's bank accounts received many thousands of dollars more than Mr. Enayat reported. The IRS determined by its analysis that Sutter had understated its gross receipts by $252,722.08. Mr. Enayat's burden was to prove where that extra $252,722.08 in deposits came from (if not sales), and he did not meet that burden simply by insisting that the sales report was accurate.

We find that Mr. Enayat failed to carry his burden of refuting the IRS's bank deposits analysis, and we find that Sutter had additional gross receipts of $252,722.08 for the year 2000.

### 2.  Sutter's Year 1999

Mr. Enayat has stipulated that Sutter received two customer checks during taxable year 1999 totaling $1,228 which were deposited into Sutter's Bank of New Hampshire account No. 8876. However, the Schedule C for Sutter attached to Mr. Enayat's 1999 Form 1040 reported zero gross receipts.  We find that the customer deposits made into Sutter's account in 1999 indicate that Sutter did have gross receipts of $1,228 in the year 1999. This corresponds with the bank deposits analysis performed by the IRS.

### 3.  Woodbury's Year 1998

Woodbury filed its Form 1120 for taxable year 1998 on September 10, 2003.  It reported gross receipts of $1,168,759. However, Woodbury's return preparer testified that he did not recall where that figure came from or how it was computed. Mr. Enayat offered no sales report summary for Woodbury's 1998 year as he did for Sutter's 2000 year.  Because we find the IRS's bank deposits analysis to be credible, and because Mr. Enayat has not introduced any evidence to refute it, we find that Woodbury had additional gross receipts of $246,352 for taxable year 1998.

However, as respondent acknowledged in his brief, Woodbury is entitled to a deduction in 1998 for the compensation imputed to Mr. Enayat. The amount of this deduction is $349,356, which more than offsets Woodbury's additional income in that year.

### 4. Woodbury's Year 1999

Woodbury proffered no sales report summary for the year 1999 and failed to file its Form 1120 for that year. As a result, the IRS prepared for Woodbury a substitute for return pursuant to section 6020(b). That substitute for return reported gross receipts of $162,050 for taxable year 1999, as determined by the IRS's bank deposits analysis. Again, because we find the IRS's bank deposits analysis to be credible, and because Mr. Enayat has not introduced any evidence to challenge that analysis, we find that Woodbury had unreported gross receipts of $162,050 for taxable year 1999. However, as in 1998, Woodbury is entitled in 1999 to a deduction of $67,200 for the compensation imputed to Mr. Enayat, thereby reducing Woodbury's taxable income in that year to $94,850.

## II. Income Mr. Enayat Did Not Report

### A. Income From the Rug Business

#### 1. Woodbury Checks Deposited to His Personal Accounts

In the notice of deficiency the IRS determined that Mr. Enayat had additional constructive dividend income of $203,273 in 1998 and $31,723 in 1999, as a result of his

depositing into his personal accounts checks made out to Woodbury.  Mr. Enayat did not treat any of the diverted checks as income on his Forms 1040 for 1998 and 1999.

Mr. Enayat acknowledges that he deposited checks made out to Woodbury in his personal accounts, but he contends that he was holding the money for the corporation, in a sort of trust or escrow arrangement, in order to prevent vendors from prematurely negotiating Woodbury's post-dated checks, and that he transferred the funds to Woodbury's accounts to cover its checks when they were actually due.  It is true that in 1998 in the aggregate Mr. Enayat deposited into his personal accounts $203,273 worth of checks payable to Woodbury and transferred $201,950 back into corporate accounts, leaving a difference of only $1,323 in his personal accounts.  Moreover, it is also true that funds received in trust by a trustee are excludable from gross income when: (i) the funds are subject to a restriction that they be expended for a specific purpose and (ii) the taxpayer does not profit, gain, or benefit in spending the funds for the stated purpose. Ford Dealers Adver. Fund, Inc. v. Commissioner, 55 T.C. 761, 771 (1971) (citing Seven-Up Co. v. Commissioner, 14 T.C. 965 (1950), Broad. Measurement Bureau, Inc. v. Commissioner, 16 T.C. 988 (1951), Angelus Funeral Home v. Commissioner, 47 T.C. 391 (1967), affd. 407 F.2d 210 (9th Cir. 1969), and Dri-Powr Distribs. Association Trust v. Commissioner, 54 T.C. 460 (1970)), affd. 456

F.2d 255 (5th Cir. 1972).  On the other hand, funds that are misappropriated from a trust by a trustee are includable in the trustee's gross income.  Webb v. IRS, 15 F.3d 203 (1st Cir. 1994); Adams v. Commissioner, T.C. Memo. 1970-104, affd. 456 F.2d 259 (9th Cir. 1972).

We have found that Mr. Enayat did not establish the factual predicate for his argument.  In 1999 he made no transfers to Woodbury to compensate for its checks, and even in 1998 his narrative simply does not line up with the facts in the record. We therefore hold that Mr. Enayat had additional constructive dividend income of $203,273 in 1998 and $31,723 in 1999. Mr. Enayat did not attempt to show that Woodbury lacked earnings and profits sufficient to support a taxable dividend.  Cf. secs. 301(a), (c)(1), 316(a).  We find these transfers to be taxable income to Mr. Enayat.

A consequence of our finding is that the Woodbury checks Mr. Enayat deposited are taxable income both to him and to Woodbury.  Thus, for a year (such as 1999) in which Woodbury has positive taxable income rather than loss, Woodbury is liable for tax on these amounts at its corporate rate, and Mr. Enayat is liable for income tax on the same amounts at his individual rate. One could observe that a corporation is a legal fiction (i.e., a fictitious person created pursuant to State law) and could complain that this double taxation is therefore founded on a

fiction; but if so, it is a fiction that Mr. Enayat chose when he incorporated Woodbury.  Use of the corporate form entails certain advantages (chiefly, limited liability for shareholders), and the business operator who wants those advantages is free to apply to the State to charter a corporation.  However, while the law grants legal rights and privileges to corporations, it also confers on them certain duties and obligations--including, in this instance, being taxable under subchapter C (sections 301-385).[30]  For Federal tax purposes, we respect Mr. Enayat's creation of Woodbury Rug Company, Inc., and we acknowledge its distinct existence.  As the Supreme Court stated in <u>Moline Props., Inc. v. Commissioner</u>, 319 U.S. 436, 438-439 (1943):

> The doctrine of corporate entity fills a useful purpose in business life.  Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the

---

[30]It is often possible to achieve the State law advantages of incorporation while avoiding the status of being a separately taxable entity for Federal tax purposes.  One such means is for an entity to be disregarded pursuant to the so-called check-the-box regulations, sec. 301.7701-3(b), Proced. & Admin. Regs. (26 C.F.R.), see <u>Med. Practice Solutions, LLC v. Commissioner</u>, 132 T.C. ____ (2009), and in the later years at issue in this case, Mr. Enayat did achieve this disregarded treatment for his LLC, Sutter, when he organized it to replace Woodbury.  Another common means is to elect subchapter S status for a corporation, see secs. 1361-1379, but Mr. Enayat made no such election as to Woodbury for the years in issue.

corporation remains a separate taxable entity. * * *
[Fn. refs. omitted.]

Woodbury is therefore a taxpayer distinct from Mr. Enayat in 1998 and 1999, and each of these two taxpayers must bear his or its own liability.

### 2. Transfers From Woodbury

We have found that Woodbury transferred to Mr. Enayat-- either by direct transfers to his personal accounts or by Woodbury checks made payable to Mr. Enayat--$349,356 in 1998 and $67,200 in 1999, totaling $416,556.  Respondent argues (consistent with the notice of deficiency) that these amounts constitute officer's compensation.  Mr. Enayat acknowledges that he transferred money from Woodbury's accounts into his personal accounts, but he claims that these transfers were repayments by Woodbury of money Mr. Enayat had lent Woodbury throughout 1998 and 1999.[31]  Mr. Enayat argues that since these transfers

---

[31]Mr. Enayat's only contention against the taxability of these amounts is that they were repayments of loans.  Mr. Enayat makes much of the fact that in 1998 and 1999 he transferred to Woodbury a substantially greater amount--$712,617--than the transfers he received from Woodbury, see supra note 12, and he urges that he can hardly have been enriched by these two-way transfers when in fact he suffered a net deficit.  However, he does not assert that if these transfers are not recognized as non-taxable loan repayments, then they are dividends rather than compensation.  The reason may be that this characterization, if successful, would deprive Woodbury of deductions for $416,556 in compensation paid, thereby increasing its corporate income tax and penalties.  (Dividends would be nondeductible to Woodbury, and pursuant to section 301(c) they would be:  income to Mr. Enayat, to the extent of Woodbury's earnings and profits;

(continued...)

represent the repayment of a shareholder loan, they are not income to him.

Whether a withdrawal of funds by a shareholder from a corporation or an advance made by a shareholder to a corporation creates a true debtor-creditor relationship is a factual question to be decided on the basis of all of the relevant facts and circumstances.  Haag v. Commissioner, 88 T.C. 604, 615 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); see also Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970); Roschuni v. Commissioner, 29 T.C. 1193, 1201-1202 (1958), affd. 271 F.2d 267 (5th Cir. 1959).  For disbursements to constitute true loans, there must have been, at the time that the funds were transferred, an unconditional obligation on the part of the transferee to repay the money and an unconditional intention on the part of the transferor to secure repayment.  Haag v. Commissioner, supra at 615-616; see also Haber v. Commissioner, supra at 266.  Direct evidence of a taxpayer's state of mind is generally unavailable, so courts have focused on certain objective factors to distinguish repayments of

---

[31](...continued)
then nontaxable return of capital, to the extent of Mr. Enayat's basis in his Woodbury stock; then gain from the sale or exchange of property for the balance.  Mr. Woodbury has also not presented any evidence of Woodbury's earnings and profits nor of his basis in its stock.)  In the absence of any contention that the payments were dividends rather than compensation, we do not address this issue.

bona fide loans from disguised dividends, compensation, and returns of capital. The factors considered relevant for purposes of identifying bona fide loans include (1) the existence or nonexistence of a debt instrument; (2) provisions for security, interest payments, and a fixed payment date; (3) treatment of the funds on the corporation's books; (4) whether repayments were made; (5) the extent of the shareholder's participation in management; and (6) the effect of the "loan" on the shareholder/employee's salary. Haber v. Commissioner, supra at 266; see also United States v. Stewart (In re Indian Lake Estates, Inc.), 448 F.2d 574, 578-579 (5th Cir. 1971); Haag v. Commissioner, supra at 616-617 & n.6. When the individuals are in substantial control of the corporation, as Mr. Enayat was in this case, such control invites a special scrutiny of the situation. Haber v. Commissioner, supra at 266; Roschuni v. Commissioner, supra at 1202. For the reasons set forth below, we conclude that the facts of record do not support Mr. Enayat's attempt to characterize the distributions that he received from Woodbury in 1998 and 1999 as repayments of bona fide loans.

First, no note or other evidence of indebtedness reflecting the amount or existence of the shareholder loans was given to Mr. Enayat by Woodbury. Furthermore, in the absence of explicit evidence of indebtedness, Mr. Enayat did not even provide an analysis of the transactions to support his assertion that every

payment from Woodbury to Mr. Enayat was preceded by a loan from Mr. Enayat to Woodbury, despite the Court's invitation to him to do so. Instead, Mr. Enayat provided only gross numbers for the transfers for the entire year.[32] Although his arithmetic is correct, his reasoning is not: Where the Enayat-to-Woodbury transfers only sometimes preceded the Woodbury-to-Enayat transfers and other times followed them, it cannot be said that the pattern of the money transfers corroborates the existence of loans from Mr. Enayat to Woodbury.

Second, Mr. Enayat's position that these transfers from Woodbury represented the repayment of loans is further belied by his testimony admitting that he treated himself, Woodbury, and all the bank accounts as one.

Third, no evidence indicates that Woodbury provided any collateral or security for repayment of these purported loan amounts or that Woodbury made any agreement with Mr. Enayat as to the time of repayment or the interest to be paid.

Fourth, Mr. Enayat offered no evidence to show whether Woodbury treated his transfers as loans (rather than as contributions) on the company's books. And, as the examining IRS

---

[32]Mr. Enayat alleges that he received net compensation of only $3,117.89 in 1998 (i.e., the $349,356 in Woodbury-to-Enayat transfers minus the $346,238.11 in Enayat-to-Woodbury transfers) and that he received no compensation at all in 1999 (since the $67,200 in Woodbury-to-Enayat transfers minus the $164,429.17 in Enayat-to-Woodbury transfers yields a negative number).

agent observed, the Schedule L, Balance Sheets per Books, on Woodbury's 1998 return showed no loans to or from shareholders.

Fifth, Mr. Enayat's position requires the unlikely conclusion that he was entitled to zero compensation for working full time at Woodbury. Mr. Enayat has worked in the Persian rug business since he was 18 years old and has owned his own store since 1994. He testified that he was actively engaged in his business, e.g., traveling to New York to purchase inventory, managing the store, selling his inventory, and so on. However, despite the flow of funds from Woodbury to Mr. Enayat, he reported zero wage income on his 1998 and 1999 Forms 1040, and Woodbury claimed zero deductions for officer's compensation (in 1998, the one year for which it did file a return). We find that some of the money paid to him by Woodbury must have been compensation for his labor,[33] and in the absence of his carrying his burden to prove a reasonable alternative, the IRS's determination stands.

That is, we conclude that Mr. Enayat did not give and receive transfers pursuant to a true debtor-creditor relationship

---

[33]See Spicer Accounting, Inc. v. United States, 918 F.2d 90, 93 (9th Cir. 1990) (an officer who performs substantial services for a corporation is an employee, and corporate payments to him are wages); Joseph Radtke, S.C. v. United States, 712 F. Supp. 143, 145-146 (E.D. Wis. 1989) (corporate payments to employees in remuneration for services are wages, and the corporation may not evade employment taxes by characterizing such compensation as dividends), affd. 895 F.2d 1196 (7th Cir. 1990).

with Woodbury.  Rather, Mr. Enayat treated Woodbury's bank accounts as if they were his personal accounts, depositing and withdrawing funds at will.  Accordingly, we find that the transfers made from Woodbury to Mr. Enayat during 1998 and 1999 did not constitute repayments of bona fide loans, but instead represented compensation to Mr. Enayat.  Therefore, we find, as the IRS determined, that Woodbury paid Mr. Enayat officer's compensation income of $349,356 in 1998 and $67,200 in 1999 by transferring funds to his personal accounts.[34]  (This finding is adverse to Mr. Enayat but is favorable to his C corporation Woodbury, as we explain below.)

B.    Transfer From Dr. Willitts

We have found that in 1998 Mr. Enayat received $455,485 from Dr. Willitts, which Mr. Enayat was obliged to pay back to Dr. Willitts at his instruction (originally expected to be in rials in Iran).  Mr. Enayat freely used the money for his rug business and his own options trading, and he substantiated repayments of only $148,899.  The IRS determined that Mr. Enayat's use of those funds for his own purposes demonstrates that he embezzled, stole, or misappropriated those funds from Dr. Willitts and that once he did so the funds became income to

---

[34]Because we do not find any creditor-debtor relationship to exist between Woodbury and Mr. Enayat, we find that any transfer of money from Mr. Enayat to Woodbury was not a loan, but rather a contribution to capital.

him.  Under section 61(a), "gross income means all income from whatever source derived".  The Supreme Court "has given a liberal construction to the broad phraseology of the 'gross income' definition statutes in recognition of the intention of Congress to tax all gains except those specifically exempted." James v. United States, 366 U.S. 213, 219 (1961) (citing Commissioner v. Jacobson, 336 U.S. 28, 49 (1949), and Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 87-91 (1934)).  The Supreme Court held that embezzled funds and, more generally, "wrongful appropriations" are includable in gross income.  Id. at 219-220.

However, Mr. Enayat's uncontradicted explanation of his arrangement with Dr. Willitts was that he was to deliver rials in Iran in exchange for dollars received in the United States, without any restriction on his use of the dollars he received because both parties understood that the rials provided in Iran would come from a different source.  The record indicates an express obligation by Mr. Enayat to repay the money to Dr. Willitts--in rials if Dr. Willitts had made it to Iran, or if not then in dollars as affirmed in the November 1999 Agreement and Release.  Mr. Enayat repaid some of the funds on demand and a portion later.  None of these facts demonstrates that Mr. Enayat wrongfully appropriated Dr. Willitts's money; rather, he owed a debt to Dr. Willitts.

Generally, a taxpayer must recognize income from the discharge of indebtedness. Sec. 61(a)(12); United States v. Kirby Lumber Co., 284 U.S. 1 (1931). "The moment it becomes clear that a debt will never have to be paid, such debt must be viewed as having been discharged." Cozzi v. Commissioner, 88 T.C. 435, 445 (1987). There is no evidence that such a moment had arrived during the years in issue with respect to Mr. Enayat's obligation to repay Dr. Willitts. On the contrary, Dr. Willitts petitioned a New Hampshire State court in late 1999 for attachment of Mr. Enayat's assets. Mr. Enayat had not fully repaid Dr. Willitts during the years in issue, but there is no evidence that Dr. Willitts had released Mr. Enayat from his repayment obligation in any year before us.

Throughout the years in issue, Mr. Enayat remained obligated to repay Dr. Willitts. As a result, we hold that Mr. Enayat did not have income from the transfer he received from Dr. Willitts.

C.   Capital Loss on the Sale of the Elm Street Property

We have found that Mr. Enayat purchased the Elm Street house as an investment in July 1998 for $210,000; that he performed some renovations on the house, but did not substantiate expenditures in any amount; and that he sold the house in December 1998 for $274,000. Mr. Enayat reported a total capital loss of $118,619 from the sale of the Elm Street property (thereby implicitly claiming renovation expenses of more than

$182,000), offset $71,812 in 1998 capital gains with part of this purported capital loss, and offset $46,807 in 1999 capital gains with the remaining purported real estate loss. See supra note 23. In the notice of deficiency the IRS disallowed these capital loss deductions.

Because we find that Mr. Enayat did not substantiate his basis in the property above his cost basis of $210,000, we find that Mr. Enayat is not entitled to a capital loss in 1998 or 1999 based on his sale of the Elm Street property.

In his post-trial brief respondent asserted for the first time that Mr. Enayat "received, if anything, a short term capital gain in the amount of $64,000" (i.e., the difference between his July purchase price and his December sale price). No capital gain adjustment was proposed in the notice of deficiency, nor in respondent's answer, nor in respondent's pretrial memorandum; and respondent did not argue this adjustment at trial nor evoke testimony that could be recognized as specifically directed to the issue. We therefore hold that the issue was not timely raised and that, if it had been, it would have been a new matter on which respondent bore the burden of proof, see Rule 142(a)(1), which he did not carry.

D. Issues Mr. Enayat Conceded

As we noted above, Mr. Enayat concedes that he received, did not report, and should have reported: $15,800 of gambling income

in 1998; $2,000 in rental income in 1998; $201,929 in business interruption insurance proceeds in 2000; and $113,800 from a stolen check in 2001.   These amounts are taxable income to Mr. Enayat.

III. Additions to Tax and Penalties

In addition to deciding the tax liability that Mr. Enayat and Woodbury will bear on the foregoing amounts, we must decide their liability for additions to tax and penalties.

A.   Mr. Enayat's Liability for the Additions to Tax

1.   Failure-To-File Addition to Tax Under Section 6651(a)(1)

Mr. Enayat does not dispute that he failed to timely file his Forms 1040 for taxable years 1998 through 2001.   The due dates and filing dates were as follows:

| Tax Year | Due Date | Return Filed |
|----------|----------|--------------|
| 1998 | Apr. 15, 1999 | Apr. 14, 2000 |
| 1999 | Apr. 15, 2000 | Oct. 9, 2002 |
| 2000 | Apr. 15, 2001 | Oct. 22, 2002 |
| 2001 | Apr. 15, 2002 | Oct. 22, 2002 |

The IRS determined that Mr. Enayat is liable for the section 6651(a)(1) addition to tax for all four of those years.   Section 6651(a)(1) imposes an addition to tax for failure to file a timely return, unless the taxpayer establishes that the failure did not result from "willful neglect" and that the failure was due to "reasonable cause".   "Willful neglect" has been interpreted to mean a conscious, intentional failure or reckless

indifference.  <u>United States v. Boyle</u>, 469 U.S. 241, 245-246 (1985).  "Reasonable cause" requires the taxpayer to demonstrate that the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file a return within the prescribed time.  <u>Id.</u> at 246; sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Mr. Enayat has not shown or even argued that he exercised reasonable care with regard to his failure to file his returns. We find that Mr. Enayat is liable for the section 6651(a)(1) addition to tax for taxable years 1998, 1999, 2000, and 2001.

### 2.   Fraud Penalty Under Section 6663(a)

The IRS determined that Mr. Enayat is liable for the fraud penalty under section 6663(a) for fraudulently understating his income on his 1998, 1999, 2000, and 2001 income tax returns. Section 6663(a) imposes a penalty equal to 75 percent of the portion of any underpayment attributable to fraud.

### a.   Legal Principles Regarding Fraud

Respondent has the burden of proving fraud by clear and convincing evidence.  See sec. 7454(a); Rule 142(b); <u>Parks v. Commissioner</u>, 94 T.C. 654, 660 (1990).  Respondent must prove by clear and convincing evidence (1) that Mr. Enayat underpaid his taxes in each year and (2) that Mr. Enayat intended to evade taxes by conduct intended to conceal, mislead, or otherwise

prevent tax collection.  See Parks v. Commissioner, supra at 660-
661.  Fraud is an actual wrongdoing with an intent to evade a tax
believed to be owing.  Marshall v. Commissioner, 85 T.C. 267, 272
(1985).  Fraud is never presumed and must be established by
independent evidence of fraudulent intent.  Petzoldt v.
Commissioner, 92 T.C. at 699.  Accordingly, the existence of
fraud is a question of fact that a court must consider on the
basis of an examination of the entire record and the taxpayer's
entire course of conduct.  Id.  However, "Fraud 'does not include
negligence, carelessness, misunderstanding or unintentional
understatement of income.'"  Zhadanov v. Commissioner, T.C. Memo.
2002-104 (quoting United States v. Pechenik, 236 F.2d 844, 846
(3d Cir. 1956)).  If respondent shows that any part of an
underpayment is due to fraud, the entire underpayment is treated
as due to fraud unless Mr. Enayat shows by a preponderance of the
evidence that part of the underpayment is not due to fraud.  See
sec. 6663(b).

Courts have developed a nonexclusive list of factors that
demonstrate fraudulent intent.  These "badges of fraud" include:
(1) understating income; (2) maintaining inadequate records;
(3) implausible or inconsistent explanations of behavior;
(4) concealment of income or assets; (5) failing to cooperate
with tax authorities; (6) engaging in illegal activities; (7) an
intent to mislead which may be inferred from a pattern of

conduct; (8) lack of credibility of the taxpayer's testimony; (9) filing false documents; (10) failing to file tax returns; and (11) dealing in cash. Spies v. United States, 317 U.S. 492, 499 (1943); Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.

Respondent contends that the following badges of fraud are present with respect to Mr. Enayat: (1) understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets, (5) engaging in illegal activities, (6) lack of credibility in testimony, (7) dealing extensively in cash, (8) pattern of conduct which implies an intent to mislead, and (9) failing to file tax returns.

### b. Mr. Enayat's Underpayments Due to Fraud

We find some of those badges of fraud to be present in this case. First, Mr. Enayat understated his income for every year at issue. Second, Mr. Enayat admittedly maintained inadequate records. Third, Mr. Enayat engaged in illegal activities (i.e.,

theft).  Fourth, Mr. Enayat dealt extensively in cash.  Fifth, Mr. Enayat has exhibited a pattern of conduct which implies an intent to mislead by admittedly receiving income in 1998, 2000, and 2001 that he did not report on his income tax returns, yet offering no explanation for his failure to do so.  Lastly, Mr. Enayat failed to timely file his tax return for every year at issue.  As a result, we find Mr. Enayat's actions were intended to conceal, mislead, or otherwise prevent tax collection.

Specifically, we find that Mr. Enayat's failure to report income he now concedes he should have reported--i.e., $16,800 in gambling income in 1998, $2,000 in rental income in 1998, $201,929 in insurance proceeds in 2000, and $113,800 in theft income in 2001--was fraudulent.  These were not trivial amounts that might have been overlooked or forgotten.  Mr. Enayat offered no explanation for how he could have filed a tax return for any of these years and omitted these items out of carelessness or negligence.  On the basis of Mr. Enayat's concession and our finding of fraud, we find that respondent has shown that some portion of Mr. Enayat's underpayment in each of the three years involving those items--1998, 2000, and 2001--was due to fraud.  As a result, the entire underpayment for each of those years is treated as due to fraud unless Mr. Enayat shows by a preponderance of the evidence that part of the underpayment is not due to fraud.  See sec. 6663(b).

### c.  Mr. Enayat's Underpayments Not Due to Fraud

#### i.  Capital Loss

As for taxable year 1998, we have already found that failure to report $16,800 in gambling income and $2,000 in rental income was fraudulent.  With respect to the capital loss claimed by Mr. Enayat on the sale of the Elm Street property but disallowed in the notice of deficiency and in this opinion, we do not find Mr. Enayat's actions to be fraudulent.  Mr. Enayat disclosed the sale of the property on his return by claiming a loss, and it was his failure to prove his basis in the property that resulted in the capital gain.  Mr. Enayat's failure to report this capital gain was due to his negligence in not properly substantiating his renovation expenses.  As a result, we do not find fraud in this particular issue.

#### ii.  Woodbury Checks and Transfers

The rest of Mr. Enayat's underreporting of income for taxable year 1998 results from our finding that he received $203,273 in dividend income from checks payable to Woodbury, as well as $349,356 in officer's compensation transferred to him from Woodbury, totaling $552,629.  On the totality of facts, we do not find these transactions to be fraudulent, despite their magnitude.

In 1998 money flowed back and forth between Woodbury and Mr. Enayat in roughly equal amounts.  In 1998 Woodbury gave

Mr. Enayat a total of $552,629, while Mr. Enayat gave Woodbury $548,188 ($346,238 in capital contributions mistakenly characterized as shareholder loans by Mr. Enayat, and $201,950 in redeposits of diverted checks). While we do not approve of the haphazard flow of money between the two, or of Mr. Enayat's using Woodbury's accounts as his personal checking accounts, we have addressed those issues in deciding whether these transactions resulted in taxable income to Mr. Enayat. Under our opinion, Mr. Enayat is liable for income tax on his end of those transfers, and we have held that the rough balance in money given and received does not excuse his liability. However, what cannot be ignored is that of all the money that flowed between the two, the total amounts going either way were very close--$552,629 versus $548,188. As a result, we do not find that Mr. Enayat intended to conceal, mislead, or otherwise prevent tax collection in his dealings with Woodbury in taxable year 1998. His error-- i.e., his assumption that the rough equivalence of the back-and- forth transfers eliminated their taxability--amounted to negligence but not fraud.

We likewise find that to be so for the year 1999. Throughout 1999 Woodbury made transfers to Mr. Enayat totaling $98,723 (i.e., $67,200 in direct transfers and $31,723 in diverted checks), while Mr. Enayat made transfers to Woodbury totaling $164,429 (all in capital contributions mistakenly

considered shareholder loans by Mr. Enayat, because Mr. Enayat did not redeposit any of the diverted checks in 1999).  Again, because throughout 1999 he actually transferred more money to Woodbury than he received--$164,429 versus $98,723--we find that Mr. Enayat's non-reporting of this income was negligent but not fraudulent.

The only other unreported income in taxable year 1999 was $1,228 in gross receipts for Sutter.  In the broader context of the facts of this case, these receipts were de minimis, and we do not find that Mr. Enayat fraudulently tried to hide this small amount.  As a result, we do not find any fraud with respect to taxable year 1999.

However, the same cannot be said for Mr. Enayat's underreporting of Sutter's gross receipts in taxable year 2000. As we already decided, Mr. Enayat fraudulently failed to report $201,929 in insurance proceeds in 2000.  As a result, the entire underpayment will be treated as attributable to fraud, absent proof as to non-fraudulent portions.  See sec. 6663(b).  This places the burden on Mr. Enayat to show that his failure to report $252,721 in gross receipts for Sutter in 2000 was not fraudulent.  He has failed to do so.  Mr. Enayat did argue that the IRS's bank deposits analysis was flawed and that he accurately reported Sutter's gross receipts because he reported the figure shown on his sales report, but we have already

disposed of those challenges and found them to be without merit. Mr. Enayat has introduced no other evidence to persuade us that such a substantial understatement of Sutter's gross receipts would be anything other than fraudulent. As a result, we find Mr. Enayat's understatement of Sutter's gross receipts in taxable year 2000 to be fraudulent.

B. Whether Woodbury Is Liable for the Additions to Tax and Penalty As Determined by the IRS

1. Failure-To-File Addition to Tax Under Section 6651(a)(1) and Fraud Penalty Under Section 6663(a) in 1998

The IRS determined that Woodbury is liable for the section 6651(a)(1) addition to tax for taxable year 1998 because Woodbury failed to timely file its tax return for that year, and that Woodbury is liable for the fraud penalty under section 6663(a) for fraudulently understating its gross receipts on its 1998 income tax return. It is true that Woodbury filed its 1998 Form 1120 late (i.e., more than four years late on September 10, 2003), that Woodbury has not shown that it exercised reasonable care in this matter, and that the return Woodbury eventually filed did understate its gross receipts. However, because we find (as the IRS determined) that Woodbury paid additional compensation to Mr. Enayat in the form of the Woodbury-to-Enayat transfers totaling $349,356, and because we hold (as the IRS concedes) that Woodbury was entitled to an additional deduction in the amount of those transfers, Woodbury ends up with no net

income in 1998, but rather a loss.  Woodbury therefore has no income tax liability for 1998.  Since the addition to tax and penalty at issue would be a percentage of the underpayment of Woodbury's now-zero income tax liability, the addition to tax and penalty are also zero.

2.    Fraudulent Failure-To-File Addition to Tax Under Section 6651(f) in 1999

The IRS determined that Woodbury was liable for the addition to tax pursuant to section 6651(f) for fraudulently failing to file a timely income tax return for taxable year 1999.  In failing to file that return, the IRS determined, Woodbury failed to report $162,050 in gross receipts for taxable year 1999.  To determine whether Woodbury fraudulently failed to file its tax return for taxable year 1999, we examine the same badges of fraud we used when considering the imposition of the fraud penalty against Mr. Enayat under section 6663(a), see Clayton v. Commissioner, 102 T.C. at 653, but we necessarily focus on Woodbury's decision not to file its return when due.  If that decision was made with the intent to evade tax, then the addition to tax under section 6651(f) may properly be imposed.  Again, respondent has the burden of proving fraud by clear and convincing evidence.  See sec. 7454(a); Rule 142(b); Parks v. Commissioner, 94 T.C. at 660-661.  To find tax fraud against the corporation, respondent is required to prove that Mr. Enayat engaged in fraudulent conduct on behalf of the corporation.

E.J. Benes & Co. v. Commissioner, 42 T.C. 358, 382 (1964), affd.
355 F.2d 929 (6th Cir. 1966).

Respondent contends that the following badges of fraud are
present in 1999 with respect to Woodbury:  (1) maintaining
inadequate records, (2) concealment of assets, (3) dealing
extensively in cash, and (4) failing to file tax returns.
Mr. Enayat infused the corporation with his personal funds and
withdrew funds at will, and he admittedly did not keep accurate
books for Woodbury.  Mr. Enayat, as the operator and sole
shareholder of Woodbury, abdicated his responsibility to
accurately report Woodbury's financial dealings and tax
obligations.  We have found that Woodbury failed to file its
return or report gross receipts of $162,050 for taxable year
1999, and when the IRS determined that Woodbury had gross
receipts in that amount, Mr. Enayat did not introduce any
evidence to prove Woodbury's gross receipts were other than as
the IRS determined.  Woodbury failed to file its return for 1999
altogether after filing its return for 1998 four years late.  In
view of all these facts, Mr. Enayat's management of Woodbury went
beyond haphazard and was fraudulent.  Mr. Enayat undoubtedly knew
that a tax return was required to be filed for Woodbury, and his
failure to file one indicates that he was trying to evade taxes.
As a result, given Mr. Enayat's pattern of filing his own tax
returns late, as well as his filing Woodbury's 1998 tax return

late, we do not find that his failure to file Woodbury's 1999 tax return was unintentional.

Therefore, on the basis of our examination of the entire record and Mr. Enayat's entire course of conduct, we find that Woodbury fraudulently failed to file its tax return for taxable year 1999. However, because we find (as the IRS determined) that Woodbury paid additional compensation to Mr. Enayat in the form of the Woodbury-to-Enayat transfers totaling $67,200 in 1999, and because we hold (as the IRS concedes) that Woodbury is entitled to an additional deduction in the amount of those transfers, Woodbury ends up with less income (i.e., $162,050 minus $67,200, or $94,850)--and therefore a lower tax liability--than the amount the IRS used in calculating the penalty.

## IV.  Whether the Statute of Limitations Bars Assessment of Mr. Enayat's or Woodbury's Tax Liabilities

Generally, the IRS must assess tax within three years after the return is filed.[35]  Sec. 6501(a).  This general rule would provide that assessments against Mr. Enayat would be restricted as follows:

---

[35]If a return is filed before its due date, it is treated as being filed on its due date for the purposes of section 6501(a). Sec. 6501(b)(1).

| Tax Year | Due Date | Return Filed | 3-Year Limitation on Assessment |
|----------|----------|--------------|--------------------------------|
| 1998 | Apr. 15, 1999 | Apr. 14, 2000 | Apr. 14, 2003 |
| 1999 | Apr. 15, 2000 | Oct.  9, 2002 | Oct.  9, 2005 |
| 2000 | Apr. 15, 2001 | Oct. 22, 2002 | Oct. 22, 2005 |
| 2001 | Apr. 15, 2002 | Oct. 22, 2002 | Oct. 22, 2005 |

The IRS issued to Mr. Enayat a notice of deficiency for 1998, 1999, 2000, and 2001 on October 17, 2006.  This was well after the three-year period of limitations on assessment had expired for each of these years, so respondent bears the burden of proving that an exception to the three-year limit on the time to assess tax applies.  See Wood v. Commissioner, 245 F.2d 888, 893-895 (5th Cir. 1957), affg. in part and revg. in part on other grounds T.C. Memo. 1955-301; Bardwell v. Commissioner, 38 T.C. 84, 92 (1962), affd. 318 F.2d 786 (10th Cir. 1963).  Respondent has shown that Mr. Enayat filed fraudulent returns by fraudulently underreporting his income for taxable years 1998, 2000, and 2001.  Because section 6501(c)(1) allows assessment at any time in the case of a fraudulent return, we conclude that the statute of limitations does not bar assessment of Mr. Enayat's tax for 1998, 2000, or 2001.

With respect to taxable year 1999, respondent failed to prove Mr. Enayat filed a fraudulent return, but we nevertheless conclude on other grounds that the statute of limitations does not bar assessment of Mr. Enayat's tax for 1999.  Section 6501(e)

permits a six-year period of limitations for assessment in the case of a taxpayer who omits from gross income an amount properly includable therein which is more than 25 percent of the amount of gross income stated on the return. On his 1999 return, Mr. Enayat reported his gross income, i.e., total income, to be $301,904. The IRS determined (and we have found) that Mr. Enayat understated his income for 1999 by $100,151--i.e., $31,723 in constructive dividends from Woodbury, $67,200 in compensation from Woodbury, and $1,228 from Sutter's additional gross receipts. The IRS will be afforded a six-year period of limitations for assessment if Mr. Enayat's understatement of income ($100,151) exceeds 25 percent of $301,904 (i.e., $75,476). We find that it does.

As for Woodbury, the IRS issued a notice of deficiency for taxable year 1998 on October 17, 2006, which was more than three years after Woodbury had filed its return for that year.[36] However, because we find that Woodbury fraudulently understated its gross receipts on its return, section 6501(c)(1) permits the IRS to assess at any time. As for taxable year 1999, Woodbury failed to file a tax return. Section 6501(c)(3) likewise permits the IRS to assess at any time where no return is filed. As a

---

[36]Woodbury filed its return for 1998 on September 10, 2003. The general three-year period of limitations on assessment expired on September 10, 2006.

result, we conclude that the statute of limitations does not bar assessment of Woodbury's tax for 1998 or 1999.

V.    Summary of Findings

To resolve the issues presented in this case, we find as follows with respect to Mr. Enayat:

(1)   He received unreported gambling income of $16,800 in 1998, which he concedes.

(2)   He received unreported rental income of $2,000 in 1998, which he concedes.

(3)   He received unreported constructive dividends from Woodbury totaling $203,273 in 1998.

(4)   He received unreported compensation from Woodbury totaling $349,356 in 1998.

(5)   He did not receive unreported income during any year in issue from the funds Dr. Willitts transferred to him in 1998.

(6)   He is not entitled to a capital loss of $118,619 (or any other amount) on the 1998 sale of the Elm Street house, and accordingly, the capital gains he offset in 1998 and 1999 are taxable; but he is not liable for tax on capital gain from that sale.

(7)   He received unreported constructive dividends from Woodbury of $31,723 in 1999.

(8)   He received unreported compensation from Woodbury of $67,200 in 1999.

(9)   He received unreported Schedule C income from Sutter of $1,228 in 1999.

(10)  He received unreported income from insurance proceeds of $201,929 in 2000, which he concedes.

(11)  He received unreported Schedule C income from Sutter of $252,721 in 2000.

(12) He received unreported theft income of $113,800 from a stolen check in 2001, which he concedes.

(13) He is liable for failure-to-file additions to tax under section 6651(a)(1) for taxable years 1998, 1999, 2000, and 2001.

(14) He is liable for the fraud penalty under section 6663(a) on the portion of his underpayment attributable to the following items:

1998:     $16,800 in gambling income and $2,000 in rental income;

2000:     $201,929 in insurance proceeds and $252,721 in gross receipts from Sutter;

2001:     $113,800 in theft income from the stolen check.

(15) He is not liable for the fraud penalty on the portion of his underpayments attributable to the following items:

1998:     $203,273 in constructive dividends from Woodbury;
          $349,356 in compensation from Woodbury; and
          $118,619 in disallowed capital loss from the sale of the Elm Street house;

1999:     $31,723 in constructive dividends from Woodbury;
          $67,200 in compensation from Woodbury; and
          $1,228 in additional gross receipts from Sutter.

As for Woodbury, we find as follows:

(1)   Woodbury had no taxable income in 1998 and therefore is not liable for tax, additions to tax, or penalties in that year.

(2)   Woodbury had unreported net taxable income of $94,850 in 1999.

(3)   Woodbury is liable for the fraudulent failure-to-file addition to tax under section 6651(f) for 1999.

To reflect the foregoing and to allow the parties to resolve the computational issues that will be affected by these findings,

<u>Decisions will be entered under Rule 155</u>.